No. 15,572.

BAKER *v.* THE PEOPLE.
(160 P. [2d] 983)

Decided July 2, 1945.

Mr. CHARLES T. MAHONEY, Mr. WILLIAM H. SCOFIELD, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

JOHN BAKER was convicted of murder in the second degree for the killing of Norman Swoboda and sentenced to serve a term in the penitentiary. To review the judgment he brings the case here by writ of error.

The evidence disclosed that defendant was twenty-four years of age and resided in Golden, Colorado, with his wife and baby daughter. Until shortly before December, 1943, he had been employed in construction work outside the state of Colorado, and upon his return to Golden was employed as a mechanic. Prior to December 26, 1943, defendant had never been arrested

except for the violation of some traffic law. He was to have reported to his draft board in Jefferson county on December 29, 1943, for induction into the army.

On December 26, 1943, defendant had been away from Golden doing some mechanical repair work and had returned to his home at about seven o'clock that evening. He found his wife absent, but learned that she had left their baby daughter there in charge of a relative, who informed him that his wife was uptown. Defendant found his wife, together with her half sister, Norman Swoboda, and Walter Patty in the Chocolate Shop drinking beer, and, joining them, they all continued drinking until about eight-thirty o'clock, when the establishment closed.

Prior to the closing of the Chocolate Shop, a brother-in-law of defendant joined the party, and there was some discussion as to where they would go. It was decided ultimately that they would repair to certain rooms in a building at the School of Mines, referred to as "Ye Dungeon," hereinafter designated as the dungeon. Before going to this latter place, several bottles of liquor were taken from Norman Swoboda's car and consumed during the evening by the various members of the party while at the dungeon.

At about ten o'clock, defendant, who was tired after his day's work, suggested going home, to which suggestion his wife replied that it was too early. Defendant, however, went home, leaving his wife, her half sister, his brother-in-law, Walter Patty, and Swoboda as the only ones of the original party remaining in the dungeon. Defendant, upon returning home, dismissed the relative who had been caring for his baby daughter and retired. Some time between eleven and twelve o'clock, his brother-in-law returned from the dungeon and, upon inquiry, informed defendant that his wife and the others still were at the dungeon, whereupon defendant made some remark about going for her and knocking some sense into her head.

During the day defendant and some of his companions, while traveling to the place where the repair work was to be done, had stopped and fired a gun which had recently been given to him, and upon returning to Golden, defendant left the gun and his repair tools in his car. Upon entering the car to return to the dungeon for the purpose of bringing his wife home, defendant picked up the gun and put it inside his trousers.

When defendant arrived at the dungeon at about twelve o'clock, he could see no lights and started to leave, but upon reflection thought he should knock to be certain whether his wife and the other members of the party were still there. Acting on this thought, he knocked, and, after a brief interval, Norman Swoboda came to the door, unlocked it, and, upon recognizing the defendant, closed and relocked the door. Shortly thereafter the lights were turned on, and Swoboda returned, unlocked the door, and defendant entered. There was no quarrel, and no harsh words were spoken between defendant and Swoboda. When defendant entered the room where his wife was, he made some remark about it taking a long time to put her clothes on, and then, in a rude or ungentlemanly manner, told her to come home with him. When his wife had put on her coat and was preceding defendant up the stairs leading from the dungeon, he gave her a push or shove, and then noticed that Swoboda was following him rather closely. He turned on Swoboda to tell him to stay back, drew his gun, and almost immediately it was discharged. The bullet struck Swoboda in the chest, and he died within a few moments.

The gun with which the shooting occurred was approximately eighteen inches long, and defendant testified that his only purpose in taking it with him when returning to the dungeon was to frighten his wife, and that as he was pulling it from his trousers it was accidently discharged.

According to the evidence, there had been some lack of harmony between defendant and his wife, and he became jealous. The evidence reveals also that defendant's wife and her half sister had been going to pool halls and shows, staying out quite late, and the wife's conduct had been such that the defendant suspicioned that she was untrue to him. When he learned that she was at the dungeon at twelve o'clock at night with strangers, and when, upon returning there, he found all the lights out, he became "mad" and angry, but his anger was directed, according to his testimony, against his wife and not toward Swoboda, notwithstanding the fact that it was Swoboda who locked and unlocked the door in his face and was, during the evening, apparently his wife's companion.

Defendant testified that when he discovered Swoboda following him so closely just before the fatal shot was fired he didn't know whether he was following for the purpose of taking his wife away from him or not. He further stated that he was jealous and suspicious of his wife's conduct, and her demeanor toward Swoboda on the evening in question caused him to be suspicious, jealous and angry. He stated many times that his only purpose in putting the gun in his trousers and his only purpose in exhibiting it was to frighten his wife, and that he had no intention whatever of killing Swoboda or any one else.

The court instructed the jury upon the crime of murder in the first and second degrees and excusable homicide, but refused to instruct upon manslaughter although such instructions were tendered and requested by defendant. The assignment of error based upon the court's refusal to give these tendered instructions is the only one which we think merits our consideration.

Our statute, '35 C.S.A., chapter 48, inter alia, provides:

"§33. Manslaughter is the unlawful killing of a

human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible, or involuntary, in the commission of an unlawful act, or a lawful act without due caution or circumspection.

"§34. In cases of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.

"§35. The killing must be the result of that sudden violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder.

"§36. Involuntary manslaughter shall consist in the killing of a human being without any intent so to do; in the commission of an unlawful act or a lawful act which probably might produce such a consequence, in an unlawful manner; provided, always, that where such involuntary killing shall happen in the commission of an unlawful act which in its consequences naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder."

The statute clearly recognizes the frailty of human nature, and its purpose is to reduce a homicide committed in circumstances set forth therein to the grade of manslaughter, either voluntary or involuntary, depending upon the facts in each particular case. It clearly appears from the statute that the unlawful killing of a human being without malice or deliberation and upon a sudden heat of passion caused by some provocation

apparently sufficient to excite an irresistible passion in a reasonable person constitutes manslaughter. Involuntary manslaughter consists in the taking of human life without any intent so to do, in the commission of an unlawful act or a lawful act without due caution or circumspection.

■ ■ The information here charged murder in the first degree and consequently included all the lower grades of criminal homicide. It follows that if there was evidence relative to manslaughter offered by either the people or the defendant, its credibility and weight was for the jury to consider in determining the facts, and proper instructions upon manslaughter should have been given. We have repeatedly held that if there is evidence tending to establish a statutory grade of homicide, the court's refusal to instruct thereon is error. *Smith v. People,* 1 Colo. 121; *Crawford v. People,* 12 Colo. 290, 20 Pac. 769; *Henwood v. People,* 54 Colo. 188, 129 Pac. 1010; *Harris v. People,* 55 Colo. 407, 135 Pac. 785; *Jarich v. People,* 58 Colo. 175, 143 Pac. 1092; *Edwards v. People,* 73 Colo. 377, 215 Pac. 855; *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103.

■ It should be borne in mind that the distinguishing features between murder and manslaughter are the ingredients of malice and deliberation. While malice may be either express or implied, it must be proved the same as any other fact, and in the absence of proof of malice, the killing of a human being is manslaughter. Malice shall be implied when no considerable provocation appears or when all circumstances of the killing show an abandoned and malignant heart. In the instant case defendant definitely and positively testified that he bore no malice towards Swoboda and that the killing was accidental. Whether there was malice, whether all the circumstances of the killing showed an abandoned and malignant heart, and whether there was sufficient provocation to reduce the crime to manslaughter, were questions of fact for the determination of the jury from

the evidence under appropriate instructions. Defendant testified that he was "mad," angry and jealous and suspicious of his wife's fidelity. When he went to the dungeon where he knew his wife was with a stranger, where liquor was being freely imbibed, and saw no lights, he testified that his suspicions were further aroused. When he rapped on the door, it was presently unlocked by Swoboda, who, when he discovered that the defendant was the person seeking admission, relocked the door, and presently the lights were turned on. These facts may have tended to further arouse defendant's suspicions and excite his jealousy to such an extent as to amount to an irresistible passion. When he entered the dungeon and stated to his wife that it had taken her a long time to put her clothes on, this evidenced a further and definite suspicion on his part as to her fidelity. When he left the dungeon, his wife preceding him, he gave her a push or shove and discovered Swoboda following him closely. He then turned to order Swoboda to stay back, and this evidenced a marked resentment, at least, of the occurrences which had taken place during the evening. In any event, it was the province of the jury to determine whether, under the circumstances, defendant was acting under an irresistible passion at the time of the killing or whether the killing was "in the commission of an unlawful act or a lawful act which probably might produce such a consequence, in an unlawful manner."

There was no such complete absence of evidence as to justify the court in refusing to instruct on manslaughter, for it has been held that however incredible, improbable, or unreasonable the testimony of an accused may seem, he is entitled to an instruction upon the hypothesis that it may be true. Wharton on Homicide (3d ed.), p. 262, §265; 4 Warren on Homicide, pp. 320, et seq., §344, pp. 430, et seq. §346; *Crawford v. People,* 12 Colo. 290, 20 Pac. 769; *Henwood v. People,* 54 Colo. 188, 129 Pac. 1010; *Harris v. People,* 55 Colo.

407, 135 Pac. 785; *Jarich v. People,* 58 Colo. 175, 143 Pac. 1092; *Funk v. People,* 90 Colo. 167, 7 P. (2d) 823; *Huffman v. People,* 96 Colo. 80, 39 P. (2d) 788.

The information in this case charged murder in the first degree. As we have said, this includes the lower grades of criminal homicide, and, as we have found, there was evidence relative to manslaughter. The credibility and weight of such evidence was for the jury to consider in determining the facts, and not a matter of law for the decision of the court. If defendant's evidence was believed by the jury, it disclosed circumstances tending to excite an irresistible passion. If properly instructed, the jury might have repudiated the defense of accidental killing and yet found defendant guilty of voluntary or involuntary manslaughter instead of murder in the second degree. The court submitted the question of excusable homicide by setting forth in haec verba section 47, chapter 48, volume 2, '35 C.S.A.

We have repeatedly held that an instruction in the language of the statute is sufficient, but it would appear that under the circumstances of this case the jury might have been advised of the defense of excusable homicide in more appropriate language. The defendant, by insisting upon his defense of accidental or excusable killing, did not thereby waive the question of manslaughter, either voluntary or involuntary, and did not make unnecessary the giving of instructions thereon. Instructions on excusable or accidental homicide, as well as manslaughter, voluntary and involuntary, under the evidence in this case, should have been given, and for the court's failure in that regard, the judgment is reversed and the cause remanded for further proceedings which shall be in harmony with the views herein announced.

MR. JUSTICE KNOUS concurs in the conclusion.

MR. JUSTICE JACKSON dissents.