No. 16,192.

READ *v.* THE PEOPLE.
(205 P. [2d] 233)

Decided March 28, 1949.

Mr. JOHN L. SWEIGERT, Mr. E. U. SANDOVAL, for plaintiff in error.

Mr. JOHN W. METZGER, Attorney General, Mr. JOSEPH E. NEWMAN, Acting Deputy, Mr. DONALD C. MCKINLAY, Assistant, for the people.

*En Banc.*

MR. JUSTICE HAYS delivered the opinion of the court.

PLAINTIFF in error, Beulah Ann Read, was, on October 27, 1947, convicted of murder of the second degree for the fatal shooting, September 26, 1947, of her infant daughter, Karol. As a result of intervening error a new trial was granted and pursuant thereto defendant again was convicted June 24, 1948, of murder of the second degree and sentenced to the penitentiary for a period of not less than twelve nor more than eighteen years, which sentence is before us for review on writ of error.

The principal question here presented is whether or not the trial court erred in refusing to permit the jury to consider the guilt or innocence of defendant upon all degrees of homicide, and in limiting the jury in its deliberations to murder of the first and second degrees.

It is contended by counsel for defendant that at the time of the alleged homicide defendant was suffering from a mental condition, referred to as traumatic amnesia, which, as said, resulted from a terrific blow to her mouth and chin administered by her husband Ralph Read, and that by reason thereof she was legally irresponsible for acts committed while in such mental condition. At the beginning of the trial defendant withdrew her plea of not guilty by reason of insanity and thereupon on leave of court entered a plea of not guilty.

In support of the above contention defendant testified that at the time of the alleged homicide September 26, 1947, she was pregnant with a second child, to wit, Mary Elizabeth, born May 11, 1948; that because of her condition she was nauseated and unable to keep food upon her stomach, which condition was aggravated by the odor from freshly killed chickens which her husband forced her to prepare for market; that at the time of the brutal assault upon her by her husband she was sitting upon the edge of her bed holding Karol, the nine-months old baby, in her arms in mortal fear that her husband would momentarily carry out his often repeated threats to kill her and the baby; that prior to

the assault her husband became enraged upon his return from town when he discovered that defendant had broken a door lock and had chipped some enamel from a wash basin during his absence; that during her husband's rage he seized Karol from her crib and after a considerable struggle defendant managed to get the baby from him; that her husband then completely destroyed most of the baby's belongings in the bedroom, including its bed, training chair, soiled clothes hamper, and many articles belonging to defendant; that while still in said rage and after the destruction of said articles, defendant's husband attacked defendant and struck a terrific blow with his fists upon her mouth and chin while she was still sitting limp upon the bed with the baby in her arms; that upon being struck by her husband everything went black and her head "roared and whirled" to such extent that she did not know and does not now know what became of the baby; that while she was in a semiconscious condition her husband continued to assault her by twisting her leg and shouting numerous threats that he was going to kill her; that prior to and during said assault defendant's husband called her many vile and indecent names; that the defendant in describing the effects of said assault upon her said: "Well, my head was roaring awfully bad, and my mouth there where he had been hitting, was hurting awfully bad, and it just seemed everything would be bright for a minute and I would see something and could tell what it was and then everything would be black and I wouldn't know what was going on or anything else. It was just like a vacuum." Defendant further testified the assault continued until Rhoda, a daughter of her husband by a former marriage, told him she would send him to the penitentiary if he carried out his threat to kill defendant; that the next she remembered was that her husband ordered her out of the bedroom and she remembers trying to get up, but

does not remember how she finally got to the kitchen where she was sitting when her head cleared.

The above testimony was not contradicted by other witnesses except in minor details. The only witness who could possibly know exactly what happened at the time of the alleged homicide was Ralph Read, defendant's husband, and strangely enough, while endorsed as a witness for the people, he was not called to disprove or contradict the above testimony.

In the light of the foregoing, defense counsel tendered instructions upon manslaughter and traumatic amnesia, upon the theory that at the time of the alleged homicide defendant was in such a dazed, confused, semiconscious or unconscious condition and state of mind as to be wholly incapable of forming the necessary criminal intent to commit the crime charged or of knowing or understanding the nature or probable result of her act. The above tendered instructions were refused and in lieu thereof the trial court in its instructions withdrew from the jury's consideration the question of defendant's guilt or innocence of voluntary or involuntary manslaughter and limited the jury in its deliberations to murder of the first or second degrees.

■ There is nothing in our criminal practice more thoroughly established or definitely settled than the principle that when there is any evidence, however improbable, unreasonable or slight, which tends to reduce the homicide to the grade of manslaughter, the defendant is entitled to an instruction thereon upon the hypothesis that the same is true, and that it is for the jury, under proper instructions, and not the trial judge, to weigh and consider the evidence and determine therefrom what grade of crime, if any, was committed; and that the court's refusal to instruct thereon is reversible error. *Smith v. People,* 1 Colo. 121; *Crawford v. People,* 12 Colo. 290, 20 Pac. 769; *Brennan v. People,* 37 Colo. 256, 86 Pac. 79; *Henwood v. People,* 54 Colo. 188, 129

Pac. 1010; *Harris v. People,* 55 Colo. 407, 135 Pac. 785; *Jabich v. People,* 58 Colo. 175, 143 Pac. 1092; *Edwards v. People,* 73 Colo. 377, 215 Pac. 855; *Funk v. People,* 90 Colo. 167, 7 P. (2d) 823; *Ingles v. People,* 92 Colo. 518, 22 P. (2d) 1109; *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103; *Huffman v. People,* 96 Colo. 80, 39 P. (2d) 788; *Payne v. People,* 110 Colo. 236, 132 P. (2d) 441; *Baker v. People,* 114 Colo. 50, 160 P. (2d) 983.

In the case last above cited, as in the present one, the trial court refused to instruct the jury upon manslaughter although pertinent instructions were tendered and requested. After quoting the statutes on manslaughter we said:

"The statute clearly recognizes the frailty of human nature, and its purpose is to reduce a homicide committed in circumstances set forth therein to the grade of manslaughter, either voluntary or involuntary, depending upon the facts in each particular case. It clearly appears from the statute that the unlawful killing of a human being without malice or deliberation and upon a sudden heat of passion caused by some provocation apparently sufficient to excite an irresistible passion in a reasonable person constitutes manslaughter. Involuntary manslaughter consists in the taking of human life without any intent so to do, in the commission of an unlawful act or a lawful act without due caution or circumspection.

"The information here charged murder in the first degree and consequently included all the lower grades of criminal homicide. It follows that if there was evidence relative to manslaughter offered by either the people or the defendant, its credibility and weight was for the jury to consider in determining the facts, and proper instructions upon manslaughter should have been given. We have repeatedly held that if there is evidence tending to establish a statutory grade of homicide, the court's refusal to instruct thereon is error."

We conclude that the trial court erred in refusing to give instructions upon voluntary and involuntary manslaughter, and in limiting the jury in its deliberations to murder of the first and second degrees.

The judgment of the trial court is accordingly reversed.