## No. 17,158.

### KUKULJAN *v.* THE PEOPLE.
(267 P. [2d] 1017)

Decided March 1, 1954.   Rehearing denied March 22, 1954.

Messrs. MOYNIHAN, HUGHES & BJELLAND, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK A. WACHOB, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for the people.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

JACK KUKULJAN shot and killed one Harold Porterfield, and upon trial, in which he was charged with first degree murder, the jury returned its verdict finding him guilty of murder of the second degree, and he was sentenced to a term in the penitentiary. He brings the case to this court by writ of error, seeking a reversal of the judgment.

Herein we shall refer to the plaintiff in error as defendant.

The evidence introduced on behalf of the people discloses that about two o'clock in the morning of Sunday, September 29, 1952, defendant fired two shots from his 30.06 rifle at an automobile in which his wife and Porterfield were driving on one of the main streets in the City of Telluride, Colorado. The first shot was fired at and punctured the front tire of the automobile and resulted in the car wobbling a bit and then proceeding on. When the Porterfield automobile was approximately fifty yards away from defendant and approaching a lighted intersection, defendant fired a shot at the "back end" of the car, piercing the canvas thereon at a distance of four or five feet above the ground striking Porterfield in the back of the head, and emerging from his right cheek, killing him instantly. After the second shot the automobile continued moving uncontrolled a distance of about two blocks; crashed into a coal shed; Porterfield's body was found with his feet in the car and his

body on the ground. Defendant's wife was in an unconscious or semiconscious condition on the side of the car opposite from Porterfield. Defendant, in his automobile, came to the scene, laid his rifle down, discovered Porterfield's body, and asked that the sheriff be called.

The sheriff, accompanied by the coroner, responded to the call, and when in the street near the automobile in which Porterfield and defendant's wife were found, defendant approached the sheriff and said to him, "Tom, put the handcuffs on me. I just killed a man. Take me to jail. I am willing to pay for it." When being taken to the county jail, according to the sheriff, defendant stated, "Well, I killed the wrong one. I should have killed her." According to the evidence of the coroner, when defendant was taken to the county jail he stated, "I am sorry about it. I think I killed the wrong person."

Shortly after defendant had been lodged in the county jail, he stated, in the presence of the sheriff and coroner, that he and his wife had attended a dance at the Elk's Club; that during the evening he looked for his wife, but was unable to find her there. He left the building and discovered his wife and deceased sitting in deceased's car; that he did not like the "attitude" they were in, so he went home, got his rifle, and waited in his car about an hour and half for them. He further stated that he figured that the only way he could stop his wife and deceased was with a gun; he wanted to reason with them. Deceased's automobile passed defendant's house, made a "U" turn, and then was driven back on defendant's side of the street. Defendant stepped out into the street, "aimed at the car and hit the tire." He then raised upon and took a shot at the back of the car as it went up the street. After firing the shots defendant started to return to his house when his attention was attracted by the crash, and when he went to the scene he found that Porterfield was dead. He gave his wife a couple of slaps and then requested that the sheriff be called. Defendant stated that after firing the first shot,

which punctured the front tire, the automobile sped on down the street. He was "mad" and raised up and fired at the car, but at no time did defendant state that either shot was fired accidently.

The wife of deceased and others called as witnesses testified that defendant's wife, who was in attendance at the dance, became ill, and some of the witnesses testified that she asked deceased to take her home; others stated that the request was that deceased accompany her outside "for some air." After the introduction of this evidence, the people rested their case.

Defendant then interposed motions to have withdrawn from the jury's consideration the charges of murder of the first and second degree, which motions were denied.

Defendant, on direct examination, testified that: He was born in Telluride, Colorado; was married and the father of two minor children; that he and deceased grew up together in Telluride, and had always been on friendly terms. The evening before the homicide, deceased and his wife were at defendant's home and had declined defendant's invitation to attend the Elks dance on the following evening, notwithstanding which sometime during the dance deceased and his wife appeared thereat. At about eleven thirty o'clock defendant sought his wife, and, being unable to find her in the Elks building, at about one fifteen o'clock, went outside and there saw his wife and deceased in a car and saw "Harold Porterfield necking and kissing my wife." He didn't then interfere because he was afraid of deceased, who was larger than he. Defendant then went home, got his car, and returned to the Elks building for the purpose of getting his wife, but found that deceased's car was no longer parked by the building. He thereupon went to various places where he thought his wife and deceased might be found, but, being unsuccessful, he "parked in front of my house and got out of the car and started in the house when Harold's [deceased's] car came by going east. I ran in then. My gun was on the rack. I ran back

out and he was coming back and I run out in the road. * * * When he seen me come out in the road he jammed the car in second gear, and if I hadn't jumped back possibly would have hit me, and I went down and shot at his front tire and the car wobbled a little bit and went on up the street." At that time he testified he did not aim to kill either Porterfield or his wife. The first shot punctured the front tire on deceased's car. The rifle used by defendant had telescopic sights, and he stated his purpose in shooting was to stop the car and get his wife out of it. A second shot was fired at a distance of about fifty yards and at or near a well-lighted street intersection, resulting in the crash about two blocks away.

Defendant, on direct examination, testified in part as follows: "Q. What prompted you to go up there [scene of the crash]? A. I still wanted some kind of an explanation. Q. Did you hear anything that directed your attention to it? A. After I fired the second shot at the rear tire of the car I started back in the house and I heard a crash up the street. I put the gun in the car and drove up to where the crash was, about two blocks. I got out of the car and laid my gun down and asked Bill Cantrell to call the sheriff." This is the only reference to a shot being fired at the rear tire. Defendant further testified that when he fired the first shot he aimed at the front tire and punctured it, and at that time he believed he could have shot either of the occupants of the automobile. He denied that he had told anyone that after finding his wife and deceased in the car at the Elks Club he went home and waited an hour and a half until they would return.

On cross-examination defendant testified that in the search at the dance for his wife he did not ask anyone if they knew where she could be found and that he avoided making his presence known when he found deceased and his wife in the car because of the likelihood of a fight; that he did not use his telescopic sight and fired both shots "from my hip." He admitted that he had

told a witness at the scene of the crash that he had fired the second shot at the car but said that he did not remember telling the sheriff or coroner that when he came to the scene of the crash and found his injured wife he struck her twice, nor did he remember stating that he had killed the wrong person.

At the conclusion of all of the evidence, defendant's counsel tendered nine instructions, all of which the court refused to give to the jury, to which refusal defendant excepted. The court, in advising the jury as to the law in the case, gave it nineteen instructions and submitted forms of verdicts under which the jury might find defendant guilty of murder of the first or second degree or voluntary manslaughter or not guilty, to the giving of which counsel for defendant also objected and excepted. As hereinbefore stated, the jury returned its verdict finding defendant guilty of murder of the second degree.

Counsel for defendant, in their motion for a new trial, specified twenty-three errors which they alleged entitled him to a new trial, and in this court his assignments of error are thirty-nine in number. These assignments may be consolidated and discussed under the following: 1. The trial court erred in instructing the jury on first and second degree murder; 2. the trial court erred in refusing to give an instruction on involuntary manslaughter.

1. In determining whether error was committed in submitting to the jury the questions of first and second degree murder, all of the evidence in the record must first be considered and, "In considering the evidence we are mindful of the presumption of law obtaining here, which is that the defendant had a fair and impartial trial before a competent court and jury, and that both discharged their respective duties under the law. The burden here is upon defendant to disclose and establish prejudicial error, if any, and it is our duty to review and apply the evidence so as to support the judg-

ment." *St. Louis v. People,* 120 Colo. 345, cited and quoted in *Kallnbach v. People,* 125 Colo. 144, 242 P. (2d) 222.

We have made a rather detailed statement of such of the evidence as we deem of sufficient importance for consideration in connection with this case, and a repetition thereof is deemed unnecessary.

The trial court carefully instructed the jury on the law of murder of the first and second degree; it carefully distinguished between the proof necessary to establish first degree murder and second degree murder; it correctly defined malice, and submitted an instruction in which it defined "Murder by any kind of wilful, deliberate and premeditated killing; murder perpetrated from a deliberate and premeditated design, unlawfully and maliciously to affect a human being other than him who is killed, and murder perpetrated by any act greatly dangerous to the lives of others and indicating a depraved mind regardless of human life." It also correctly instructed on voluntary manslaughter and submitted to the jury four verdicts: One finding the defendant guilty of murder of the first degree; another finding defendant guilty of murder of the second degree; another finding defendant guilty of voluntary manslaughter, and one finding defendant not guilty. As heretofore stated, the jury returned its verdict finding defendant guilty of murder of the second degree.

■ It is manifest to us that the evidence before the jury would have supported a verdict either of first or second degree murder or voluntary manslaughter. There was competent evidence before the jury to warrant it in finding either express or implied malice, together with the deliberation and premeditation necessary to constitute murder, and such as to make it the mandatory duty of the trial court to submit the verdicts above mentioned.

Under these circumstances it is unnecessary for us to discuss our opinions in *Tate v. People,* 125 Colo. 527, 247 P. (2d) 665; *Eckhardt v. People,* 126 Colo. 458, 250 P

(2d) 1009, and *Walker v. People,* 126 Colo. 135, 248 P. (2d) 287, and other decisions relied upon by defendant. A careful reading of our opinions in these cases will disclose that there is nothing therein helpful or applicable to the factual situation presented in the instant case.

2. Defendant tendered an instruction on involuntary manslaughter, quoting the statutory definition thereof, which instruction the court refused to give; it also refused to submit to the jury the question of involuntary manslaughter. These refusals defendant's counsel assign as error, and they rely largely on our opinion in *Baker v. People,* 114 Colo. 50, 160 P. (2d) 983, for support. In their brief here we find several statements with reference to our opinion in *Baker v. People, supra,* to the following effect: "The defendant pulled the loaded gun from his pocket and pointed it point-blank at the deceased. The gun discharged instantly, killing the deceased." and "The defendant Baker turned on deceased, pulled the loaded gun out of his pocket and pointed it point-blank at the deceased." These statements are not supported by our opinion nor by the record in the Baker case. We call attention to the fact that in that case the following statement is to be found: "The gun with which the shooting occurred was approximately eighteen inches long, and defendant testified that his only purpose in taking it with him when returning to the dungeon was to frighten his wife, and that as he was pulling it from his trousers it was *accidently discharged."* Also in the Baker case there was ample evidence necessitating the giving of an instruction on excusable homicide, as the same is defined in section 47, chapter 48, '35 C.S.A., and in this connection we said: "There was no such complete absence of evidence as to justify the court in refusing to instruct on manslaughter, for it has been held that however incredible, improbable, or unreasonable the testimony of an accused may seem, he is entitled to an instruction upon the hypothesis that it may be true." (citing cases)

■■ In the instant case there is not to be found in the record a scintilla of evidence that defendant accidently discharged the rifle which resulted in death. The evidence is undisputed and conclusive that defendant intentionally and purposely fired the rifle at the back of an automobile in which his wife and the deceased were riding and that when the shot resulting in death was fired, defendant was "mad." It needs no citation of authorities to demonstrate that when defendant fired at the automobile with its occupants he was committing an unlawful act. Death resulted from "the commission of an unlawful act which in its consequences naturally tends to destroy the life of a human being" and, under the statute, where death thus results, "the offense shall be deemed and adjudged to be murder." Section 36, chapter 48, '35 C.S.A.

A study of the record convinces us that there are no other matters presented by the assignment of errors here which merit consideration.

Accordingly, the judgment is affirmed.