No. 21603.

GAYLORD W. EDWARDS *v.* THE PEOPLE OF THE STATE OF COLORADO.
(418 P.2d 174)

Decided August 29, 1966. Opinion modified and as modified petition for rehearing denied September 26, 1966.

396

FRANKLIN C. DOUGLAS, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, JAMES W. CREAMER, JR., Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE PRINGLE delivered the opinion of the court.

PLAINTIFF in error, Gaylord Edwards, was found guilty by a jury of murder in the second degree of one Floyd E. Harper. He was thereafter sentenced to a term of fifteen to twenty-five years in the State Penitentiary. From this judgment he seeks review by writ of error. We will refer to the plaintiff in error as the defendant or by name and to the defendant in error as the People.

The record discloses that Edwards and his wife, then Lucy Patton, were married approximately six months before the homicide. At the time of the marriage, Harper had been living in Mrs. Patton's home for approximately a year and a half. Mrs. Patton had two daughters who were also living in the house. One of the daughters, testifying for the People, stated that Harper's relationship in the household was merely that of a boarder. The inter-relationship between the five people under one roof was amicable enough for the first five months. Edwards testified that he and his wife were getting along very well together during this time and that he was not particularly bothered by Harper's pres-

ence. In due time these circumstances changed. Edwards became dissatisfied with Harper's failure to pay his fair share of the rent and other expenses. Moreover, Edwards was suspicious that Harper's relationship with his wife was more than it ought to be. Edwards wanted Harper to move out and expressed this desire to his wife on several occasions. Apparently Mrs. Edwards did not share her husband's feelings and Harper continued to live with the Edwardses. After quarreling over the matter repeatedly, Edwards moved out of the house.

While they were estranged, Edwards regularly called his wife in an attempt to reconcile their differences. With this object in mind, Mrs. Edwards was to meet the defendant after work on October 23, 1963. When she failed to appear, Edwards proceeded to her residence. On the way, he stopped at the Bonanza Bar for a brief period of libation and conviviality with his friends. Throughout this activity Edwards made no mention of his domestic difficulties nor of his feelings one way or the other toward Harper.

One Woros, the bartender, testified that he had been keeping Edwards' rifle as a favor ever since he had moved out of the house. Edwards told Woros that he was going hunting the next day and that he would get his rifle in the morning. Woros insisted that if Edwards wanted his rifle he would give it to him then rather than be disturbed the next morning. Edwards agreed, loaded the rifle and placed it in his truck. Later that evening, about 6:30 P.M., Edwards tried to phone his wife. One of the daughters answered the phone but refused to call her mother, saying that she was tired and had gone to bed. After stopping at a neighbor's house, Edwards proceeded to his wife's residence. The testimony is in considerable conflict as to events which occurred after this point.

According to the eldest daughter, the defendant's wife had retired early and was sleeping in her own bed.

Meanwhile, Harper and the two girls were watching television in another room. Some time later the two girls and Harper retired to their respective rooms. When the defendant admitted himself to the house, the wife awakened the eldest girl and expressed her concern because the defendant was in the house. It is important to note that, according to the girl's testimony, the wife was not sleeping with Harper when Edwards came into the house. On the other hand, Edwards testified that after he admitted himself to the house he went to his wife's bedroom and failing to find her there, he proceeded to Harper's room. There, he said, he found his wife as she was turning on the light. Edwards testified that his wife was in bed with Harper and was dressed in a slip or nightgown and that Harper was attired in pajama bottoms. The defendant told his wife that he wanted to speak with her. Thereafter, an argument ensued between the defendant and his wife in the kitchen. Within moments, the fray was joined in by the two girls and Harper.

According to Edwards, Harper stated that the defendant did not have any business in the house and that he, Harper, was taking care of things now. Edwards also related that Harper produced a knife and attacked him and cut him on the thumb. Edwards then testified that as all of the lights were turned out he was forcibly pushed out of the door. The girls, however, testified that the defendant was not forced from the house but that he left of his own accord and that they had no recollection of seeing a knife in anyone's hand. After the defendant was out of the house, the door was closed. The lock on the door was defective, and Harper apparently braced the door shut with his body. According to the defendant's testimony, the eviction from his own home was the final outrage. He went to his truck, removed his rifle and proceeded back to the door. Finding the door held closed against his efforts, Edwards fired once through the door. The eldest daughter testified

that after Edwards left the house she observed him through a window which afforded a view of the back porch. From this vantage point, she watched the defendant as he retrieved his rifle, not from the truck but from a location next to the washing machine. Immediately following this, the first shot was fired. The bullet apparently hit Harper who then took refuge in the interior of the house. The door thus freed, Edwards entered the house and commenced firing at the noises made by the retreating Harper.

After the initial barrage, Edwards reloaded his rifle and fired several times at the already wounded Harper. A total of thirteen shots were fired, seven of which struck the deceased. The defendant left the scene, leaving Harper dead or dying on the floor. Edwards went to a neighbor's home, announced that there had been some trouble and that he thought he had probably killed a man. After Edwards called his attorney, he left the neighbor's house. The next morning members of the Adams County Sheriff's office found Edwards hiding in the basement of a vacant house. In rebutting Edwards' testimony that Harper had slashed him on the thumb with a knife, the People produced the testimony of the officer in charge of fingerprinting at the Adams County Jail. The officer specifically recalled that Edwards had no hand wounds at the time he was fingerprinted. The People also produced the testimony of a Dr. Troster who examined Edwards in jail for a swollen wrist. Troster stated that Edwards made no complaint of a knife wound or any other injuries. Troster further testified that he certainly would have noticed and treated any knife wound on the thumb of the magnitude complained of by the defendant.

From the jury's determination of guilt based on the above facts, the defendant assigns the following as error:

1. The trial court erred in denying the defendant the opportunity to ask members of the jury upon voir dire concerning their ability to maintain adherence to the

court's instructions if it should appear from the evidence that the defendant's wife and the deceased were carrying on an adulterous relationship.

2. The trial court erred in refusing to admit the testimony of the mother of the deceased as to her efforts to dissuade the deceased from living with the defendant's wife.

3. The trial court erred in not granting defendant's motions for judgment of acquittal at the close of the People's case on the charges of first and second degree murder on the ground that the evidence did not warrant such a verdict.

4. The trial court erred in the giving of numerous instructions as to murder, malice, the death penalty, life imprisonment and the use of the term "abandoned" and "malignant," although the testimony did not justify their consideration.

5. The trial court erred in refusing to give the defendant's instruction pertaining to provocation.

6. The trial court erred in refusing to instruct on involuntary manslaughter although consideration of such would have been consistent with the testimony.

7. The trial court erred in not affording to the defendant a fair and impartial trial based upon the law and the evidence as reflected by inconsistent rulings sustaining objections by the People and in denying objections by the defendant.

We shall deal with the assignments of error in the order set forth above.

I.

The question which the defense proposed to ask the prospective jurors on voir dire is as follows:

"If it should appear that the wife of the defendant in this case and the deceased were unduly intimate, could you and would you, notwithstanding that fact, return a verdict based wholly and solely upon the evidence and the instructions of the court?"

The trial court refused to permit the question and the defendant assigns this refusal as error.

It is not the purpose of voir dire examination by counsel to educate the prospective panel of jurors to a particular theory of the case. Its purpose is rather to enable counsel to determine whether any members of the panel are possessed of beliefs which would cause them to be biased in such a manner as to prevent his client from obtaining a fair and impartial trial. The scope of voir dire questioning is largely within the discretion of the trial judge and unless there is a gross abuse of discretion in permitting or refusing specific questions we will not disturb the trial court's ruling in such matters. *Routa v. People,* 117 Colo. 564, 192 P.2d 436. One accused of a crime is not entitled as a matter of right to a sympathetic jury, but only to one which will hear the matter fairly and impartially. The answers to the question posed and stricken here, whether in the affirmative or the negative, would not have aided the defendant in obtaining a jury which would view his case in a fair and impartial manner. If the answer were in the affirmative, it would have indicated that the juror would follow the law and would not be biased or prejudiced by sympathy *for* the defendant. If the answer were in the negative, it would indicate that the juror would be prejudiced in the defendant's favor and give the People a challenge for cause. We cannot hold that the trial court's ruling here worked such prejudice as a matter of law to counsel's ability to determine whether the juror's mental state was one of bias *against* his client and thus deprive him of a fair and impartial jury so as to require us to declare the ruling to be reversible error.

II.

The trial court did not err in refusing the proposed testimony of the deceased's mother, Mrs. Richardson, as to her conversation with the defendant's wife. The purpose of the proposed testimony was to raise the

inference that a meretricious or adulterous relationship existed between the deceased and the defendant's wife.

During the defendant's case in chief, the defense made an offer of proof that the testimony of Mrs. Richardson would show that approximately a year prior to the killing and six months before the defendant's marriage to his wife the witness had a conversation with Mrs. Edwards, then Lucy Patton, in which Mrs. Edwards made certain statements to Mrs. Richardson from which an inference of a meretricious relationship could arise. The trial court was correct in holding that the proposed testimony of Mrs. Richardson was inadmissible. It was an attempt to establish an adulterous relationship by means of hearsay evidence.

### III.

A review of the testimony produced by the People in their case in chief makes it clear that there was at the close of the People's case ample evidence to make a case of either first or second degree murder and the trial court was correct in denying the motion for acquittal at this stage of the proceedings.

The defendant went to the home of his estranged wife; he placed his loaded hunting rifle on the back porch of the house; he entered the house, he engaged in an argument with his wife and the deceased; he became angry; he left the room and proceeded to the back porch where he retrieved his rifle; he fired through the door, which had been closed after his exit, knowing full well that persons were on the other side of the door; having wounded the deceased, the defendant shot at him several more times as he chased him through the house. He exhausted his ammunition, reloaded his gun and emptied it into the deceased's body; he fled and sought refuge in the basement of a vacant house.

Not only does the above evidence support an inference of implied malice necessary for second degree murder, it also creates a strong case for first degree murder if the jury found the existence of express malice.

For this reason, the trial court properly denied the defendant's motions of acquittal as to the charges of first and second degree murder.

### IV.

In his fourth assignment of error, the defendant contended that the extreme provocation of discovering his wife in bed with the deceased, combined with an insufficient cooling period after the provocation, were sufficient, as a matter of law, to reduce the homicide to manslaughter. The defendant asserts, therefore, that the trial court erred in giving those instructions which pertain to the various degrees of murder. We do not agree. Even if we were to assume that the defendant's statements in regard to the alleged compromising position in which he found his wife and the deceased were true, his own testimony is that he left the house; went back to the truck for his rifle; and then came back to the house in order to shoot the deceased. On the basis of the defendant's own theory, the jury was entitled to find that the defendant's alleged irresistible passion had ample time to cool after he had seen the purported act of infidelity and thus his acts would be within the ambit of the definition of murder.

### V.

We find no merit in the defendant's complaint that the trial court erred in failing to submit to the jury his tendered instruction on provocation. While we recognize the right of a defendant to have the jury instructed on his theory of the case if there is evidence to support it, *Wertz v. People,* 160 Colo. 260, 418 P.2d 169, this right does not mean that the jury must be instructed on the defendant's theory in the particular verbiage tendered by the defendant. See *Coca v. People,* 154 Colo. 488, 391 P.2d 462. All that is required is that his theory be accurately embodied in the instructions given by the court. *Clews v. People,* 151 Colo. 219, 377 P.2d 125. With this in mind, we have compared the trial court's instruction on provocation with those ten-

dered by the defendant and find that the defendant's theory of the case was adequately covered by the court's instructions.

## VI.

■ Nor do we believe that the trial court erred in refusing to instruct the jury on involuntary manslaughter.

Involuntary manslaughter is defined by C.R.S. 1963, 40-2-7 as:

"Involuntary manslaughter shall consist in the killing of a human being without any intent so to do; in the commission of an unlawful act or a lawful act which probably might produce such a consequence, in an unlawful manner; provided, always, that *where such involuntary killing shall happen in the commission of an unlawful act which in its consequences naturally tends to destroy the life of a human being,* or is committed in the prosecution of a felonious intent, *the offense shall be deemed and adjudged to be murder."* (Emphasis supplied.)

Defendant's evidence raised the issues of self-defense, justifiable homicide, killing in the heat of passion, and not guilty by reason of insanity. Instructions were submitted to the jury concerning all of these defenses. No evidence in the record supported any theory that the defendant did not intend to kill the deceased once he started shooting. The evidence showed that the defendant fired at least seven shots which struck Harper, some even after Harper was lying on the floor unable to move as a result of the previous shots. No inference could possibly be drawn from this testimony that the defendant was engaged in harmless target practice with no intent to kill. The *"natural consequences"* of Edwards' conduct certainly *"tended to destroy the life of the person"* [human being] at whom the bullets were aimed and thus Edwards' *conduct* was taken out of the operation of the involuntary manslaughter statute. The jury correctly found the intent to kill was present when they found the defendant guilty of murder in the second

degree, under the instructions of the court requiring intent in order to convict of second degree murder. *Baker v. People*, 114 Colo. 50, 160 P.2d 983, strongly relied upon by the defendant here, was a situation in which the evidence was that the gun went off accidentally. Not so here.

## VII.

 Defendant maintains in his final assignment of error that the trial court made so many errors in ruling upon the reception of evidence that the cumulative effect was to deprive the defendant of a fair trial and show bias on the part of the trial judge. He cites ten instances of such rulings which he claims are insupportable. We have examined the rulings complained of and find that in most cases the court clearly ruled correctly. The remaining matters are of such small moment as to constitute harmless error, if erroneous at all. We find no accumulation of unsupported rulings so as to even suggest that under the totality of the circumstances there was a lack of fundamental fairness at the defendant's trial.

The judgment is affirmed.