No. 21989.

STEPHEN WAYNE FERRIN *v.* THE PEOPLE OF THE STATE OF COLORADO.
(433 P.2d 108)

Decided November 6, 1967.

DELANEY & BALCOMB, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, JOHN P. MOORE, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE. DAY delivered the opinion of the Court.

IN the district court of Eagle County Stephen Wayne Ferrin, aged fifteen, to whom we will refer as Stephen or defendant, was convicted of first degree murder of his younger brother, David.

The material facts are not in dispute. We recite them only in enough detail so as to make clearer the issue involved in this writ of error.

Stephen was one of seven children residing with his family in the small mountain community of Basalt, Colorado. He was an average student, well behaved and quiet. He was reared in the Mormon faith and attended church and Sunday school regularly. He had a close and affectionate relationship with David, who was two years younger.

On the date of the homicide, Stephen and David were at a neighbor's ranch to visit with a playmate, Roger Sharp, aged thirteen. The Ferrin brothers accompanied Roger who had some irrigating to be done. Stephen carried with him a .22 single shot rifle. The irrigation chore took about 45 minutes, and after it was completed the three boys started back to the ranch house area intending to play baseball. Roger and David were in front, and as they passed through a gate on the Sharp

property, Stephen ordered them to come back through the gate. The boys did not respond to the "command" and Stephen fired a shot near David's feet. David responded, "I told you I am invulnerable just like Superman. * * * There is really nothing you can do to me." Stephen then fired a second shot which hit David causing him to fall screaming. Defendant then ordered Roger to return through the gate, which Roger did. Then Stephen fired a third shot at David.

Roger was ordered to strip down. Then Stephen marched Roger, sans pants, up the road about an eighth of a mile. Roger remarked to the defendant to the effect "You are a Mormon boy." Defendant then threw down his gun and started to cry "real loud." Roger recovered his trousers and went to a neighbor's house and called the authorities. Defendant continued to lay on the ground and cry incessantly. He was still crying at the house when the authorities arrived; and was in such an emotional state that he was taken to a doctor.

Roger testified that prior to the shooting there was no quarrel or disagreement between the brothers. He said that after the shooting defendant's face was "different" and that it "looked real serious."

At the arraignment on the information charging that Stephen "did feloniously, willfully and of his malice aforethought kill and murder" David, pleas of not guilty and not guilty by reason of insanity were entered.

Defendant was examined by four psychiatrists, each of whom made reports as to his mental capacity at the time of the shooting. Stephen was sent to the State Hospital at Pueblo after he was unable to gain admission to the Colorado Psychopathic Hospital in Denver due to lack of space. Dr. Hewitt Ryan, the psychiatrist at the State Hospital, found Stephen to be legally insane and made such a report to the court.

Thereafter the district attorney requested another examination of the defendant, and this time he was sent to the Colorado Psychopathic Hospital. There Dr. John

MacDonald, chief psychiatrist, and Dr. James Warren Redman, a psychiatric resident, examined the defendant and reported their conclusion that he was sane.

By private arrangements through the members of defendant's church, a fourth psychiatrist, Dr. J. P. Hilton, was consulted and arrangements were made to have him examine Stephen. Dr. Hilton concluded that Stephen was criminally insane.

Trial was to a jury with both the issues of guilt and insanity consolidated in the one proceeding. However, it developed that with the homicide admitted the sole issue was whether the defendant was mentally accountable for the killing, and, if so, in what degree. The jury, after deliberating for approximately twenty-four hours, found the defendant sane and guilty of murder in the first degree. They fixed the penalty at imprisonment for life at hard labor.

Under the five main headings in the summary of argument, defendant has — including the subparagraphs — advanced a total of fourteen alleged errors occurring in the trial. With the exception of one, we characterize them as technical, non-prejudicial, and in the category of imperfections likely to occur in any trial of like duration.

The chief assignment of error to which we give our attention was the failure of the trial court to instruct the jury on and to submit to it a verdict on the lesser included offense of voluntary manslaughter. The request for such an instruction by the defendant was denied by the court.

As has been stated, four medical experts examined the defendant. Two of them found that defendant was so diseased in mind that he was criminally insane. It was Dr. Hilton's opinion that the defendant was a paranoid schizophrenic with delusions of being persecuted. Dr. Ryan's conclusion was that the killing resulted from a psychotic episode. The two other doctors — Dr. MacDonald and Dr. Redman — recognized the

extreme irrationality of the act, but stated that they did not find evidence of mental disease. Both concluded that the defendant was sane at the time of the killing within the definition in the criminal law: that he did understand right from wrong.

All of the medical experts, however, were in agreement that defendant was incapable of coping with anger or releasing it in a normal manner, and that the shooting was the result of an explosion of pent-up anger and emotion.

■ The statutes dealing with manslaughter are C.R.S. 1963, 40-2-4; 40-2-5, and 40-2-6. After quoting the sections verbatim (they are the same now as then), this court said in *Baker v. People,* 114 Colo. 50, 160 P.2d 983:

"The statute clearly recognizes the frailty of human nature, and its purpose is to reduce a homicide committed in circumstances set forth therein to the grade of manslaughter, either voluntary or involuntary, depending upon the facts in each particular case. It clearly appears from the statute that the unlawful killing of a human being without malice or deliberation and upon a sudden heat of passion caused by some provocation apparently sufficient to excite an irrestible passion in a reasonable person constitutes manslaughter. * * *

"It should be borne in mind that the distinguishing features between murder and manslaughter are the ingredients of malice and deliberation. While malice may be either express or implied, it must be proved the same as any other fact, and in the absence of proof of malice, the killing of a human being is manslaughter. * * *"

■ In the *Baker* case the court then went on to point out that from the evidence the defendant in that case definitely and positively testified that he bore no malice toward his victim, that he was "angry, jealous and suspicious." Quoting again from the *Baker* case:

"* * * Whether there was malice, whether all the circumstances of the killing showed an abandoned and

malignant heart, and whether there was sufficient provocation to reduce the crime to manslaughter, were questions of fact for the determination of the jury from the evidence *under appropriate instructions.* \* \* \*" (Emphasis added.)

The People argue that if the testimony of the defendant's psychiatrists were to be accepted by it, the jury would have been compelled to return a verdict of not guilty by reason of insanity, *i.e.,* the testimony would not allow a verdict of a lesser degree of homicide than murder. They contend this is so because the psychiatrists who were of the opinion that the defendant was insane arrived at that conclusion on the premise that the act was the result of an "irresistible impluse"; that such an impulse does not comport with and is contrary to the word "voluntary" as that word is used in the statutes. In other words, it is the argument of the People that if the act were irresistible it could not be voluntary.

It is our view that the evidence taken as a whole is not such as to require the absolute and positive conclusion that the killing was either deliberate murder with malice aforethought or excusable because of insanity. Cases which are "all white or all black" — either murder or nothing — are not of frequent occurrence; we need only note the many, many decisions in which we have said the lesser degrees of the crime must be submitted in the instructions. See *Baker v. People, supra,* and the textbook works and cases cited therein. See also *Gallegos v. People,* 136 Colo. 321, 316 P.2d 884; *Hardy v. People,* 133 Colo. 201, 292 P.2d 973; *Read v. People,* 119 Colo. 506, 205 P.2d 233.

It was established that Stephen had an affection for and no malice toward his brother. The common thread running through the testimony of all the psychiatrists, and one fact upon which they agreed, was that the killing was the result of an explosion of pent-up

anger or emotion, which the defendant was not capable of controlling or resisting. The statute uses both the words "voluntary" and "irresistible." We do not interpret their use by the legislature as being mutually exclusive as argued by the People. The statute itself speaks of voluntary "manslaughter" as involving "passion irresistible."

It is further contended by the People that the record is devoid of evidence that the defendant was provoked into killing his brother, or that there was an injury inflicted upon the defendant by the victim either real or threatened, and that absent such evidence manslaughter must be ruled out. We agree that the very essence of the manslaughter instruction is that the killing must be preceded by a serious and highly provocative injury inflicted upon the person committing the homicide. *McKenna v. People,* 124 Colo. 112, 235 P.2d 351.

We do not read into the statute that the provocation or the injury inflicted on the killer by the victim, whether real or threatened, must immediately precede the act. In the *Baker* case the "anger, jealousy and suspicion" was "built up" in the mind of the defendant over a period of time. Baker had been home "musing" over the whereabouts of his wife. When he found her in the apartment of the victim he waited until she dressed. The wife was walking ahead of Baker and the deceased following them. The shooting occurred when the victim failed to respond immediately to Baker's command to stay back.

In the instant case the defendant related to all of the psychiatrists a series of incidents which when put together provided the "pent-up anger." Defendant had been "depantsed" by his playmates, which had caused him great humiliation and shame. He also became greatly distressed when he was teased by David and Roger about the fact that he would always lose on the pin-

ball machine or that he was going to fail a test in school. That some of the defendant's emotion was built up by the actions of superiority lorded over him by David, who was, as has been noted, two years younger, was demonstrated by Dr. MacDonald's testimony that David responded to the shot into the ground at his feet, "I told you I am invulnerable just like Superman. * * * There is really nothing you can do to me." That remark, Dr. MacDonald testified, triggered the second and third shots which were fired at David and which killed him. We stated in *Read v. People, supra:*

"There is nothing in our criminal practice more thoroughly established or definitely settled than the principle that when there is any evidence, however *improbable, unreasonable or slight,* which tends to reduce the homicide to the grade of manslaughter, the defendant is entitled to an instruction thereon upon the hypothesis that the same is true, and that it is for the jury, under proper instructions, and not the trial judge, to weigh and consider the evidence and determine therefrom what grade of crime, if any, was committed; and that the court's refusal to instruct is reversible error." (Emphasis added.)

▌ There were many events which Stephen nurtured within him, which, if considered singly, would not constitute sufficient provocation. But putting them all together so as to constitute, as the psychiatrists described, "pent-up anger and emotion," we cannot say that there was no evidence of provocation, however "improbable, unreasonable or slight."

We hold that the manslaughter instruction should have been given; it was reversible error not to do so.

The judgment is reversed and the cause remanded for new trial.

Mr. Justice McWilliams dissents.

Mr. Justice Sutton not participating.

Mr. Justice McWilliams dissenting.

I dissent for the reasons so ably set forth in the majority opinion.

By way of summary, then, in my view the majority opinion points up very clearly that in the instant case there is *no evidence* that a "serious and highly provoking injury sufficient to excite an irresistible passion in a reasonable person" was inflicted upon Stephen by David and that as a result thereof Stephen "upon a sudden heat of passion" killed his brother. Therefore, it was not error for the trial court to refuse to instruct the jury on voluntary manslaughter.

Should the "depantsing" incident be deemed a "serious and highly provoking incident," it should be noted that there is nothing to indicate that it was David who did the "depantsing" and furthermore this incident occurred about two years before the homicide.