No. 23323.

Richard Bernard Sanchez *v*. The People of the
State of Colorado.
(470 P.2d 857)

Decided June 22, 1970.

WILLIAM H. NELSON, JOHN W. GROVES, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, for defendant in error.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

PLAINTIFF in error, Richard Bernard Sanchez, was convicted in the District Court of Mesa County of murder in the second degree and was sentenced to the penitentiary for a term of ten to forty years. By this writ of error,

he seeks reversal of the judgment of conviction, and a new trial.

■ Sanchez asserts three grounds for reversal. We need to consider only the one proposition — that the trial court committed prejudicial error in refusing to instruct the jury on the lesser included offense of involuntary manslaughter. From a review of the record, we have concluded that Sanchez was entitled to such an instruction. Accordingly, the judgment of conviction must be reversed and the cause remanded for a new trial.

The events out of which the murder charge arose occurred in the early morning hours of October 13, 1966. At approximately 3 a.m. Felix Martinez was found dead in his apartment across the street from the Grand Junction police station. Medical evidence showed that death was caused by a puncture type stab wound which pierced the heart, allowing massive hemorrhaging. Sanchez, who had been observed earlier in the vicinity of the apartment house where Martinez was found, was arrested at his home at approximately 4:35 a.m. He was found sleeping in bed, fully clothed, and when aroused appeared to be in a drunken condition. He was taken to the police station and fully advised of his rights. Because of his obvious condition of intoxication, questioning was discontinued and later that day he was released from custody without any charges being filed against him.

Sanchez' intoxicated condition was the result of an extended drinking spree which commenced during the early afternoon hours of the preceding day and continued sporadically into the early morning hours of October 13. He and one Lucy Vigil, Mrs. Martinez' sister, were visiting in the Martinez apartment with Mrs. Martinez, awaiting Felix who finally arrived between 1 and 2 a.m. Felix had also been drinking and was described by his wife as being drunk when he arrived at the apartment. The men resumed their drinking. Eventually Martinez and his wife became involved in a violent argument, in which blows were exchanged. Sanchez

sought to intervene and presumably it was in the course of his peacemaking effort that Martinez was stabbed.

The evidence was far from clear as to the course of events. Although both were present in the same room, neither Mrs. Martinez nor Lucy Vigil would admit they saw Sanchez stab Felix.

After things had presumably quieted down, Sanchez and Lucy Vigil left for their home. Mrs. Martinez testified that she observed Martinez lying on the floor. Thinking he was asleep she did not bother him; but when she saw blood on his clothing she became alarmed and notified the police. Oddly enough, the investigating officer testified that he found Martinez seated at the kitchen table in a slumped-over position. The officer, not knowing whether Martinez was still alive, put him on the floor to administer first aid and then discovered that he was dead.

Three weeks later Sanchez contacted the Grand Junction police and requested to talk concerning the Martinez death. On November 11 he gave an extensive written statement in which he admitted stabbing Martinez twice during their argument. This statement was admitted into evidence. The voluntariness of this statement is not here challenged, nor is Sanchez' waiver of his right to have an attorney present at the time it was taken. At the trial Sanchez testified in his own behalf. He repudiated the statement and denied the stabbing.

Among other things the statement contains the following questions and answers:

"Q. Is my understanding correct, then, up to the point that you stabbed him when he lunged at you, this had been mostly argument, then, between the two of you, it was verbal?

"A. Yes, and threatening, more or less, like he said, 'I will kill you, you little son-of-a-bitch, who do you think you are?' It was just stuff like that."

\* \* \* \*

"Q. Now, going back a minute to the kitchen and to the

table, where was Felix at the time you stabbed him in the room, I mean was he standing up or sitting down or in a chair or by the table, or where was he?

"A. When I stabbed him?

"Q. Yes.

"A. No, that is when he lunged at me, he was sitting in a chair like this, and I told him not to hit his wife. I think he knocked the living tar out of her, and he was going to do the same with me."

\* \* \* \*

"Q. Yes, did he sit back down at the table, or just what did he do?

"A. I don't know. I really don't know. I just took out of there. I didn't mean to harm him, I mean, I just wanted to protect myself and get the hell out of there.

"Q. When you stabbed him, you did not intend to kill him?

"A. Oh, no, I did not intend to kill him. I didn't intend to hurt him. I just thought that I had cut him a little bit and got out of there, you know."

\* \* \* \*

"Q. Now, Richard, is there anything else concerning what happened on this night in question that you would like to tell us or that you would like to include in this statement?

"A. Well, yes, I guess, and that is, hell, I was just afraid of getting hurt, otherwise I wouldn't have used a knife on him. I was afraid, if you got somebody to call names and say, 'I will kill you, you little son-of-a-bitch,' or something like that — you know, you get pretty mad, and then if he was intoxicated or something, you just don't know what he might do or anything, and look what it got me."

The trial court instructed the jury on second degree murder and voluntary manslaughter only; it refused to give the instruction on involuntary manslaughter, although such was specifically requested and tendered by Sanchez.

 It is well-established that a defendant in a homicide case is entitled to an instruction on lesser included offenses when there is evidence, however manifested, whether presented by the people or by the defense, to indicate the commission of the lesser offense. *Gallegos v. People,* 136 Colo. 321, 316 P.2d 884; *Read v. People,* 119 Colo. 506, 205 P.2d 233. This is so because, as was stated in *Henwood v. People,* 54 Colo. 188, 129 P. 1010, the constitution and laws of the state provide for trial by jury of a defendant charged with homicide. The jury, and it alone, must determine the facts; and no court, either trial or appellate, has the right to constitute itself as a trier of facts. The court there stated:

"* * * No matter how lightly the court may regard the testimony offered on behalf of the defense, the question of its weight and the credibility of the witnesses is to be determined by the jury, properly instructed as to the law. Unless this course is followed, a defendant is deprived of his constitutional right of a trial by jury. * * *"

In *Crawford v. People,* 12 Colo. 290, 20 P. 769, the court pointed out the hazards of failing to sufficiently instruct on grades of homicide when there is any evidence whatever tending to establish a certain grade thereof:

"* * * But where there is an affray, and where self-defense is a defense relied on, the court exercises an exceedingly dangerous prerogative in refusing to charge upon the minor as well as the graver offenses covered by the indictment. He should be absolutely certain that there is an entire absence of evidence bearing upon the particular grade or grades omitted."

In *Read v. People, supra,* the court stated the rule in the following manner:

"There is nothing in our criminal practice more thoroughly established or definitely settled than the principle that when there is any evidence, *however improbable, unreasonable or slight,* which tends to reduce the homicide to the grade of manslaughter, the defendant is entitled to an instruction thereon upon the hypothesis

that the same is true, and that it is for the jury, under proper instructions, and not the trial judge, to weigh and consider the evidence and determine therefrom what grade of crime, if any, was committed; and that the court's refusal to instruct thereon is reversible error." (Citing cases.) (Emphasis added.)

As observed in *Ferrin v. People,* 164 Colo. 130, 433 P.2d 108, it is an infrequent ocurrence when a homicide is "all white or all black." In our view the evidence here is sufficient to require consideration by the jury of both grades of manslaughter, as well as second degree murder.

It was the defendant's theory — and there was evidence to support it — that he was threatened with harm from Martinez; that he was only acting in self-defense at the time of the stabbing; and that he did not intend to kill Martinez, but only to protect himself. In other words, if in the act of defending himself he over-reacted to a belief that he was in danger from Martinez and the killing resulted from the application of excessive force, then the exercise of his right of self-defense, lawful in the first instance, became unlawful by reason of the manner in which he defended himself. Under these circumstances the killing would not be legally justified. However, the criminal culpability, assuming the evidence was believed by the jury, would be limited to involuntary manslaughter — "* * * the killing of a human being without any intent so to do; in the commission of an unlawful act or a lawful act which probably might produce such a consequence, in an unlawful manner; * * *." C.R.S. 1963, 40-2-7.

Thus it was the jury's function to determine in the first instance whether Sanchez did in fact administer the fatal blow, he having repudiated the incriminating admission in his written statement. It was also within the jury's province to disbelieve his testimony of repudiation and to ascribe truth to the written statement from which the jury could conclude that his actions were

within the realm of self-defense and were thus justifiable; or the jury could conclude his actions were beyond the scope of legitimate self-defense by reason of the application of excessive force; or the jury could conclude that Sanchez did in fact intentionally kill as a result of a serious provocation, but without malice; or, finally, that he killed maliciously, but without deliberation or premeditation. Under the evidence the jury was entitled to consider each and all of these alternatives. That we may concur in the belief of the trial court that the evidence is "improbable, unreasonable or slight," is of no moment, as such determination is in the exclusive province of the jury.

Although it is not necessary to resolve the other two contentions of prejudicial error in view of our determination above, concerning the challenge to the statement elicited on rebuttal from witness Vandertook — that Sanchez in the initial questioning admitted that animosity existed between him and Martinez — we do not attempt to resolve this question; rather, since a new trial is required, we direct attention to the recent decisions of this Court commanding *in camera* hearings as a prerequisite to the admission into evidence of such statements. See *Whitman v. People,* 170 Colo. 189, 460 P.2d 767; *Neitz v. People,* 170 Colo. 428, 462 P.2d 498; *Velarde v. People,* 171 Colo. 261, 466 P.2d 919.

The judgment is reversed and cause remanded for a new trial.

MR. JUSTICE PRINGLE and MR. JUSTICE GROVES not participating.