The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Robert William SHAW, Defendant-Appellant.

No. 81SA203.

Supreme Court of Colorado, En Banc.

June 1, 1982.

As Modified on Denial of Rehearing June 28, 1982.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Morgan Rumler, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Lee Jay Belstock, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, Robert William Shaw, who was convicted of second degree murder, section 18–3–103, C.R.S.1973 (1978 Repl. Vol. 8), asserts in this appeal [1] several grounds for reversal, including the court's refusal to submit the lesser offenses of reckless manslaughter and criminally negligent homicide to the jury. We conclude that there was evidence to support the submission of these offenses to the jury and the court's failure to do so constitutes reversible error requiring a new trial. Although this disposition renders it unnecessary to consider other issues raised by the defendant,[2] we nevertheless elect to address a matter most likely to arise upon retrial— that is, whether the routine destruction of original notes relating to a prosecution witness's statement to a police detective violated due process of law so as to require the court to strike the trial testimony of the witness and of the detective relating to the prior statement.

I.

On January 23, 1979, the body of Dale Stubblefield was found in a remote area on the outskirts of the town of Agate in Elbert County, Colorado. The cause of death was determined to be loss of blood from internal injuries to the chest region secondary to multiple gunshot wounds. No wallet or other identification was found on the body and the pockets of the victim's trousers were pulled outwards. A subsequent police investigation led to the defendant's arrest and trial on charges of first degree murder after deliberation,[3] felony-murder,[4] rob-

1. This appeal was filed originally in the Court of Appeals and was transferred to this court because of constitutional claims raised by the defendant. *See* sections 13–4–102(1)(b) and 13–4–110, C.R.S.1973.

2. The other claims relate to the court's severance of the defendant's trial from that of Royal Foreman, who was originally charged with the defendant, various evidentiary rulings made by the court during the trial, the court's failure to give certain instructions tendered by the defendant, and the propriety of the sentence.

3. Section 18–3–102(1)(a), C.R.S.1973 (1978 Repl. Vol. 8).

4. Section 18–3–102(1)(b), C.R.S.1973 (1978 Repl. Vol. 8).

bery,[5] and attempted robbery,[6] based on the fatal shooting of Stubblefield on January 16, 1979, in Arapahoe County, Colorado.

The prosecution's evidence established the following events leading to Stubblefield's death. Stubblefield, who previously had worked at the defendant's Silco service station in Aurora, was out of work and living with Brenda Paulk on the day of the shooting. On January 13 the defendant had $430 stolen from his home, and the next day he mentioned to a friend, Tim Rodman, that he believed Stubblefield had taken the money. Stubblefield had occasionally visited the defendant at his home, and during a January 14 visit the defendant asked him and others present if they knew anything about the theft.

According to Brenda Paulk, Stubblefield left his home at 10:30 a. m. on January 16, carrying a wallet with identification cards but no money. He was without transportation at this time because he had left his car at the defendant's home for some mechanical repairs. Paulk never saw Stubblefield again.

Anita Soffa, who was a reluctant prosecution witness, testified that during the morning hours of January 16 she was at the defendant's home with Royal Foreman, Stubblefield and the defendant. The four talked about going to a race track to drag race, and eventually she drove off with the defendant in his vehicle while Foreman and Stubblefield drove in Foreman's pickup truck. After the four stopped at Foreman's apartment for beer, they continued their trip and eventually took a dirt road to a hilly uninhabited area some distance from Aurora. The defendant, after asking Soffa to remain in the car, grabbed a gun from underneath the car seat and left the vehicle. A short time later Foreman came up to the vehicle and said "Annie you better get out

of her to go get help." Soffa backed up the car over the dirt road, parked it near some oil tanks, and after turning on the radio heard four popping sounds. Later Foreman and the defendant drove up behind her. Foreman asked her to drive his truck back to town. She drove the truck to the defendant's home, and the defendant and Foreman arrived there about two hours later.

The prosecution elicited testimony from Soffa and a police detective, Alan Duer, about a statement given by her to the detective on February 22, 1979, in exchange for a prosecutorial promise of immunity. In her statement Soffa told the detective that on the trip to the race track she and the defendant smoked a "joint" and the defendant did not appear nervous nor did he talk about Stubblefield. She also stated that about a week after January 16, after mentioning to the defendant her awareness of the shooting, he told her that "he fired the first shot to scare Dale [Stubblefield], to find out if he had ripped him off." Soffa also stated to Detective Duer:

"I asked Bob where he shot him and Bob replied that the first shot was in the heart so that Dale would not suffer. Then Bob said he had shot Dale once in the head. Bob told me he shot Dale a total of three times."

Notes were made of Soffa's statement by both Detective Duer and a police secretary who was present during the interrogation. A summary of Soffa's statement was prepared and Duer's notes as well as those of the secretary were destroyed. The summary was made available to Soffa and her attorney.[7]

Soffa admitted during her trial testimony that the summary, which she had the opportunity to review after its preparation, was an accurate representation of her statement

**5.** Section 18–4–301, C.R.S.1973 (1978 Repl. Vol. 8).

**6.** Sections 18–2–101 and 18–4–301, C.R.S.1973 (1978 Repl. Vol. 8).

**7.** Detective Duer interviewed Soffa for several hours and at her attorney's request prepared a

summary of her statement instead of a verbatim transcript. Two days after the interview Detective Duer showed Soffa the summary in her attorney's office. Soffa at that time agreed that it represented a correct statement of what had transpired during the interview but declined to sign it upon the advice of her attorney.

to Detective Duer. According to the detective's testimony, the notes were destroyed because

"[w]e felt they had no value. It is standard procedure once your notes are reduced to a written report and you read the report and concur with its authenticity, then the notes are not relevant and we destroy them."

Defense counsel moved to strike the testimony of Soffa as well as the testimony of Detective Duer relating to Soffa's statement.[8] The court denied the motion, concluding that the defendant had not been prejudiced by the destruction of the notes.

The prosecution also presented testimony from Don Morgan, a friend of the defendant, about admissions made to him by the defendant, wherein the defendant stated that "Dale has been shot, Dale was dead ... the body would not be found," and "there wouldn't be any ID on [his] body." On February 20, 1979, a search warrant for the defendant's home was executed. A .25 caliber automatic pistol was seized and subsequent laboratory testing identified it as the weapon which caused Stubblefield's death.

The defendant testified in his own behalf. He related that shortly before the shooting he had lost his service station due to financial difficulties and that his wife had left him. He also admitted to a long history of drug abuse which had progressed to a daily habit during this period of his life. Three days before the shooting, on January 13, he learned that $430, which he had saved to begin paying off debts, had been stolen from his home. When Stubblefield came to his house the next day the defendant mentioned to him the theft of the money, since Stubblefield knew where the defendant kept his house key and was not above his suspicion. The defendant described his consumption of a large quantity of amphetamines as well as some marijuana and beer on the day of the shooting. Later in the day Royal Foreman stopped by his house and suggested a trip to the race track. Stubblefield, who was present, and Anita Soffa, the defendant's girlfriend, agreed to go along.

During the trip the defendant started to think about his debts, his wife, the recent loss of money and numerous other problems. He became lost and found himself on a dirt road leading to a large field. By the time he stopped near the field, he had decided to kill himself. He then described the events immediately surrounding the shooting. He took a gun from under the seat of his car and walked down the dirt road past Foreman's truck. Foreman called out to him and the defendant turned around, fired a warning shot, and warned Foreman that he would not be stopped. The defendant continued walking down the road and suddenly felt his arms pinned from behind. The defendant then testified:

"I can remember turning and struggling with somebody and then pushing them away ... I didn't care who it was. I didn't know who it was ... I recall firing the gun but I don't remember exactly what sequence ... I don't recall the motion of my hand firing the gun ... like I say, all I remember was pushing away; I was pushing away from whoever it was and then, like I say, I heard the explosion. I didn't really remember the actual muzzle action or pulling the trigger or feeling the gun in my hand ... I looked down and I saw Dale, then I realized who it was and what had happened ... I can remember still wanting to achieve my purpose, you know. I put the gun to my mouth and I pulled the trigger and there was no more shells ... I can remember that because I burned my lips. I had burned my bottom lip on the gun."

The defendant described how he accompanied Foreman back to his car and asked

8. At trial Detective Duer originally testified that his interview with Anita Soffa had been tape recorded, transcribed verbatim, summarized, and then the tape and transcription had been destroyed in accordance with routine police procedure. During the *in camera* hearing on the defendant's motion to strike, Detective Duer corrected his former testimony and stated that, instead of taping the interview with Soffa, he and a police secretary had taken notes of the interview and then a summary of her statement was prepared from those notes.

Soffa to drive Foreman's truck home. After Soffa left, the defendant and Foreman retrieved Stubblefield's body, placed it in his car and took it to a field in Elbert County.

At the conclusion of the evidence the defendant submitted instructions on reckless manslaughter and criminally negligent homicide. The court rejected these instructions and submitted the case to a jury on first degree murder after deliberation, felony murder, second degree murder, robbery and attempted robbery. The jury returned a guilty verdict to second degree murder. The court sentenced the defendant to a term of 38 to 50 years and this appeal followed.

## II.

We first consider the trial court's refusal to instruct on the lesser offenses of reckless manslaughter and criminally negligent homicide. In a long line of cases we have consistently held that the refusal to instruct on a lesser included offense in a homicide case is reversible error as long as there is some evidence, however slight, tending to establish the lesser included offense. In *Crawford v. People*, 12 Colo. 290, 20 P. 769 (1888), this court reversed the defendant's second degree murder conviction due to the trial court's refusal to instruct on voluntary manslaughter and formulated what has since become basic doctrine:

> "When there is any evidence whatever tending to establish a certain statutory grade of criminal homicide, and the court refuses to charge the jury with reference thereto, error is committed; but if there be a total absence of evidence relating to the particular grade disregarded, the charge cannot be successfully challenged on the ground of such omission.
>
> \* \* \* \* \* \*
>
> "By statute the accused in criminal cases is permitted to become a witness, and when once upon the stand all the ordinary rules of evidence apply to him. He is subject to cross-examination, his testimony may be impeached, the circumstances under which he testifies may be considered, and perjury on his part can be as readily disclosed as in the case of other witnesses. The jury ought to give his testimony such credit and such weight as in their judgment shall, under all the circumstances, be proper. They may accept it as true or they may reject it as false. But, however incredible or unreasonable such testimony shall seem, the accused is entitled to an instruction upon the hypothesis that it may be true.
>
> \* \* \* \* \* \*
>
> "We do not say that [manslaughter] should have been the verdict, or that the jury would have found differently had they been properly instructed. What we do say is that there was not an entire absence of evidence tending to establish the crime of manslaughter, and that defendant was entitled to an instruction with reference thereto. It is obviously impossible for us to hold that the error thus committed was without prejudice." *Id.* at 292–94, 20 P. at 770–71.

*Accord People v. Watkins*, 196 Colo. 377, 586 P.2d 43 (1978) (second degree murder conviction reversed where court refused to instruct jury on criminally negligent homicide); *People v. Miller*, 187 Colo. 239, 529 P.2d 648 (1974) (first degree murder conviction reversed where court refused to instruct on lesser offenses of voluntary and involuntary manslaughter); *Sanchez v. People*, 172 Colo. 168, 470 P.2d 857 (1970) (second degree murder conviction reversed due to court's failure to instruct on involuntary manslaughter); *Ferrin v. People*, 164 Colo. 130, 433 P.2d 108 (1967) (first degree murder conviction reversed where court refused to instruct on voluntary manslaughter); *Gallegos v. People*, 136 Colo. 321, 316 P.2d 884 (1957) (first degree murder conviction reversed due to court's refusal to instruct on voluntary and involuntary manslaughter); *Read v. People*, 119 Colo. 506, 205 P.2d 233 (1949) (second degree murder conviction reversed due to court's refusal to instruct on voluntary and involuntary manslaughter); *Baker v. People*, 114 Colo. 50, 160 P.2d 983 (1945) (second degree murder conviction reversed where court refused to

instruct on voluntary and involuntary manslaughter).

"Cases which are 'all white or all black'—either murder or nothing—are of infrequent occurrence", *Ferrin v. People*, 164 Colo. at 136, 433 P.2d at 111, and whenever there is any evidence establishing a lesser degree of homicide, it is the duty of the court to submit that lesser offense to the jury under appropriate instructions, "[n]o matter how lightly the court may regard the testimony offered on behalf of the defense." *Henwood v. People*, 54 Colo. 188, 199, 129 P. 1010, 1014 (1913). *Read v. People, supra*, repeats the principle applicable here:

> "There is nothing in our criminal practice more thoroughly established or definitely settled than the principle that when there is any evidence, however improbable, unreasonable or slight, which tends to reduce the homicide to the grade of manslaughter, the defendant is entitled to an instruction thereon upon the hypothesis that the same is true, and that it is for the jury, under proper instructions, and not the trial judge, to weigh and consider the evidence and determine therefrom what grade of crime, if any, was committed; and that the court's refusal to instruct thereon is reversible error." 119 Colo. at 509, 205 P.2d at 235.

■ To be sure, the prosecution in this case presented evidence sufficient to permit a jury to conclude that the defendant was aware that his actions were practically certain to result in Stubblefield's death and that, therefore, he was guilty of second degree murder. *See, e.g., People v. Mingo*, 196 Colo. 315, 584 P.2d 632 (1978). However, what is critical to this appeal is that the defendant's testimony presented a substantially different version of the homicide—one which provided a sufficient basis for instructing the jury on the lesser offenses of reckless manslaughter and criminally negligent homicide. Reckless manslaughter consists of acting recklessly and thereby causing the death of another. Section 18–3–104(1)(a), C.R.S.1973 (1978 Repl. Vol. 8). A person acts recklessly "when he

consciously disregards a substantial and unjustifiable risk that a result will occur or that a circumstance exists." Section 18–1–501(8), C.R.S.1973 (1978 Repl. Vol. 8). Criminally negligent homicide consists of causing the death of another by conduct amounting to criminal negligence. Section 18–3–105(1)(a), C.R.S.1973 (1978 Repl. Vol. 8). Criminal negligence, as defined in section 18–1–501(3), C.R.S.1973 (1978 Repl. Vol. 8) and as applicable to homicide, means a failure to perceive, through a gross deviation from the standard of reasonable care, a substantial and unjustifiable risk that death will result from certain conduct. *People v. Taggart*, Colo., 621 P.2d 1375 (1981). The distinction between acting recklessly and acting with criminal negligence is the difference between, on the one hand, becoming aware yet consciously disregarding a substantial and unjustifiable risk of death from one's conduct, and, on the other, failing to perceive, through a gross deviation from the reasonable care standard, a substantial and unjustifiable risk that death will result from one's conduct. *See People v. Bettis*, 43 Colo.App. 104, 602 P.2d 877 (1979).

■ The defendant's testimony, if believed, furnished the jury an evidentiary basis to conclude that the defendant, aware that his suicide attempt might precipitate a life-endangering intervention by Foreman, Stubblefield or Soffa, nevertheless disregarded this risk and shot Stubblefield out of an impulsive reaction caused by Stubblefield's seizure of the defendant from behind. Similarly, if the defendant's testimony was believed, the jury might have concluded that the defendant's shooting of the victim was the result of his gross deviation from reasonable care in failing to perceive a substantial and unjustifiable risk that his attempted suicide would prompt the life-threatening action which the victim took in this case to prevent the defendant's self-destruction. This testimony, regardless of how improbable or unreasonable it might seem, nevertheless was sufficient to entitle the defendant to instructions on the lesser offenses of reckless manslaughter and crim-

ally negligent homicide.[9] We hold that the court's refusal to submit these charges to the jury under appropriate instructions constituted reversible error.

## III.

Because the issue is likely to arise again upon retrial, we address the trial court's refusal to strike the testimony of Anita Soffa as well as that of Detective Duer relating the content of her statement to him. The defendant claims that the destruction of the original notes, which were made by Detective Duer and a police secretary during the detective's interrogation of Soffa, constituted the suppression of evidence potentially favorable to his defense in violation of due process of law. *U.S.Const.* Amend. XIV; *Colo.Const.* Art. II, Sec. 25. We do not agree.

Generally the defendant's right to discovery of a witness's statement includes the right to examine notes which are substantial recitals of the statement and were reduced to writing contemporaneously with the making of the statement. *See, e.g., Goodwin v. District Court,* 197 Colo. 6, 588 P.2d 874 (1979); *Ortega v. People,* 162 Colo. 358, 426 P.2d 180 (1967). The state has the duty to employ regular procedures to preserve such discoverable evidence. *See Garcia v. District Court,* 197 Colo. 38, 589 P.2d 924 (1979); *People v. Roblas,* 193 Colo. 496, 568 P.2d 57 (1977); *People v. Poole,* 192 Colo. 56, 555 P.2d 980 (1976). We have not required governmental bad faith as a condition for the imposition of a judicial sanction in connection with a defendant's due process claim based upon the loss or destruction of evidence. *People v. Morgan,* 199 Colo.

237, 606 P.2d 1296 (1980); *People v. Harmes,* 38 Colo.App. 378, 560 P.2d 470 (1976). It is the character of the evidence lost, not the degree of culpability in the loss, which is constitutionally significant. *See generally United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Detective Duer, acting as agent for the prosecution, should have preserved the original notes of Soffa's statement so that defense counsel could have examined the summary against the notes and made use of both forms of documentation in his cross-examination of the witness. However, the destruction of the notes, by itself, does not add up to a violation of due process of law. What the record also must show is that the destroyed evidence is constitutionally material. In the context of a completed trial, constitutional materiality means evidence which, when evaluated in light of the entire record, likely would have affected the outcome of the trial. *E.g., United States v. Agurs; supra; People v. Gallegos,* Colo., 644 P.2d 920 (1982); *People v. Thatcher,* Colo., 638 P.2d 760 (1981).[10]

In this case the record fails to show that the loss or destruction of the notes deprived the defendant of evidence which was material to his defense. The witness Soffa acknowledged that she had read the five-page summary after it had been prepared by Detective Duer and that it accurately summarized her statement to him. Detective Duer also testified that the summary was an accurate representation of Soffa's statements during the police interview. There is nothing in the record suggesting that Soffa told the detective any-

---

**9.** Our analysis of the evidence takes into account the principle that voluntary intoxication is not a defense to reckless manslaughter or to criminally negligent homicide. Section 18–1–804, C.R.S.1973 (1978 Repl. Vol. 8); *People v. DelGuidice,* Colo., 606 P.2d 840 (1979).

**10.** This constitutional standard of materiality applies to evidence which is unavailable to the defense because of governmental loss or suppression, and is equally applicable whether the evidence be characterized as substantive, impeachment or exculpatory. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49

L.Ed.2d 342 (1976). In fashioning a remedy for governmental loss or destruction of evidence, trial courts should impose a sanction calculated to ensure the defendant's right to a fair trial and to preserve the integrity of the fact-finding process. In this respect, the court may consider the degree of governmental culpability involved in the loss or destruction of the evidence and the need to deter such conduct in the future. *See People v. Morgan,* 199 Colo. 237, 606 P.2d 1296 (1980); *People v. Roblas,* 193 Colo. 496, 568 P.2d 57 (1977).

thing that might be construed as favorable to the defendant but which was not included in the summary. Thus, the summary was nothing less than what it purported to be—a concise recital of Soffa's statement to Detective Duer about the facts and circumstances surrounding the homicide. Since the record does not establish that the destruction of the original notes resulted in the loss of evidence material to the defense, the defendant's due process right was not violated and the trial court did not err in refusing to strike the testimony of Anita Soffa and Detective Duer. *See, e.g., United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) (no denial of due process where government lost, apparently through negligence, discoverable tape recordings of interviews with government witnesses); *People v. Roblas, supra* (trial court erred in suppressing testimony of government's key witness where tape recording of witness's statement to police was inadvertently destroyed); *People v. Bynum*, 192 Colo. 60, 556 P.2d 469 (1976) (routine erasure of videotape of booking process not a denial of due process requiring dismissal of charges).

The judgment is reversed and the cause is remanded to the district court for a new trial consistent with the views herein expressed.